1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES FIRE INSURANCE COMPANY, et al., | IN ADMIRALTY |
| Plaintiffs/Counterclaim Defendants, | NO. C20-00401-RSM |
| v. | ORDER RE: MOTIONS FOR SUMMARY JUDGMENT |
| ICICLE SEAFOODS, INC., et al., | |
| Defendants/Counterclaim Plaintiffs. | |

## I.     INTRODUCTION

This matter comes before the Court on parties' cross-motions for summary judgment. Defendants-Counterclaim Plaintiffs Icicle Seafoods, Inc., and ISVesselCo, Inc. (collectively, "Icicle") have moved for partial summary judgment regarding the applicability of Washington law, Icicle's right to a jury trial, and interpretation of the deductible language.  Dkt. #74. Plaintiff-Counterclaim Defendants United States Fire Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, Great American Insurance Company of New York, Argonaut Insurance Company, Endurance American Insurance Company, Houston Casualty Company, and Certain Underwriters at Lloyd's, London (collectively, "Insurers") have filed a response and cross-motion on those issues, Dkt. #86, as well as a motion for summary judgment on Icicle's counterclaims.  Dkt. #111.  Parties have not requested oral argument, and the Court

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT - 1

finds it unnecessary to resolve the relevant issues.  Parties' motions are resolved as set forth below.

## II.    BACKGROUND

A full background of this case is not necessary given the Court's previous orders in this matter.  *See* Dkts. #127, #128. This action arises out of an insurance claim for Loss of Hire ("LOH") damages claimed by Icicle as a result of engine damage on the vessel R.M. THORSTENSON ("the RMT") in December 2016 that interrupted Icicle's fish processing operations in 2017 and 2018.  From 2018 until 2020, parties unsuccessfully attempted to settle the LOH claim.  Insurers adjusted Icicle's LOH claim in the amount of $966,638.48, which Icicle refused to accept on the basis that their damages approximated $4 million.  Dkt. #1 at ¶ 11, Dkt. #18 at ¶ 86.

On March 13, 2020, Insurers filed a declaratory judgment action in this Court seeking a declaration of Icicle's actual loss of net earnings sustained as a result of the RMT's December 2016 engine damage and as limited by the policy terms and conditions between the parties.  Dkt. #1 at ¶ 30.  On June 5, 2020, Icicle counterclaimed for violations under breach of contract, breach of duty of good faith and fair dealing, the Washington Consumer Protection Act, RCW 18.86, and the Insurance Fair Conduct Act ("IFCA"), RCW 48.30.015.  Dkt. #18 at ¶¶ 88-98.

Icicle filed the instant Motion for Partial Summary Judgment on January 21, 2021, seeking a determination that (1) Washington law applies to this dispute; (2) Icicle is entitled to a jury trial; (3) the 14-day deductible contained in the LOH endorsement was triggered by the RMT's engine failure; (4) the 14-day deductible does not require proof of economic loss; and (5) the 14-day deductible was exhausted during the 2017 cod season.  Dkt. #74.  On February 8, 2021, Insurers moved for summary judgment on the same issues.  Dkt. #86.  On May 20,

2021, Insurers filed a subsequent motion for summary judgment seeking dismissal of Icicle's counterclaims.  Dkt. #111.

## I.     DISCUSSION

### A.  Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Material facts are those which might affect the outcome of the suit under governing law.  *Id.* at 248.  In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).  When parties have filed simultaneous cross-motions on the same claim, "the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."  *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (quoting *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)) (internal quotations omitted).

On a motion for summary judgment, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004).  The Court must draw all reasonable inferences in favor of the non-moving party.  *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994).  However, the non-moving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B.  Applicability of Washington or Federal Law

The Court will first address what law governs this marine insurance policy dispute. Icicle contends that Washington law applies while Insurers argue that federal common law and federal maritime law apply.  Dkt. #74; Dkt. #86.  Icicle relies on the Ninth Circuit's holding in *Bohemia, Inc. v. Home Ins. Co.*, which read U.S. Supreme Court precedent as holding "that state law will control the interpretation of a marine insurance policy only in the absence of a federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice."  725 F.2d 506, 510 (9th Cir. 1984).  Insurers argue that *Bohemia* does not apply here, since the policy sets forth a choice of law provision that expressly selects federal admiralty law and federal common law as the governing law.

The two contracts at issue in this dispute are USA Marine Insurance Policy No. PK-16-060 ("USA Marine Policy") and Lloyds London's Unique Market Reference No. B0507/M16PH06590 ("Lloyds Slip Policy").  Both contain the following provision under the Loss of Charter Hire Insurance heading: "This insurance is subject to ~~English law and practice~~ U.S. LAW AND PRACTICE."  Dkt. #18 at 56, 92 (strikeout in original).  A separate section of the Lloyds Slip policy reads: "In any case arising out of this insurance, the same shall be governed by and construed in accordance with Washington law and practice, jurisdiction . . . ."  *Id.* at 72.  Insurers argue that "U.S. LAW AND PRACTICE" must be construed as a choice of law provision expressly selecting federal admiralty and common law.  Dkt. #86.  The Court disagrees.  While the policy does not explain what was intended by the phrase "U.S. law and practice," the strikeout indicates parties' intention to be bound by American law as opposed to English law—a choice that merely distinguishes between the laws of two countries, not between federal law and the law of any U.S. state.

Insurers' arguments to the contrary are unavailing. Relying on two cases from the Ninth and Fifth Circuits, Insurers argue that in maritime contracts, "United States law" means federal common and statutory law. In *Flores v. Am. Seafoods Co.*, the contract expressly stated, "[t]his Agreement shall be governed exclusively *by the general maritime laws of the United States and applicable United States Statutes*" and that the "obligations, rights and remedies with respect to the employment relationship established by this Agreement . . . shall not be enlarged, supplemented or modified *by the laws of any State or local jurisdiction*." 335 F.3d 904, 910 (9th Cir. 2003) (emphases added). Consistent with the plain language of the contract, the Ninth Circuit determined that "general maritime laws of the United States and applicable United States Statutes" referred to federal common and statutory law governing admiralty cases. *Id.* at 918, n.8. *Flores* does not extend to the instant case, where the plain language of the contract makes no reference to U.S. general maritime laws and statutes, nor does it expressly disclaim application of the laws of any state or local jurisdiction.

Fifth Circuit case *Foster Wheeler Energy Corp. v. An Ning Jiang MV*, 383 F.3d 349 (5th Cir. 2004), likewise does not support Insurers' position. In that case, the court addressed two choice-of-law clauses in bills of lading for carriage between Spain and China, and construed "U.S. law" as meaning the federal Carriage of Goods by Sea Act ("COGSA"). Not only did the *Foster* court construe "U.S. law" to mean one specific federal statute, COGSA, but it considered the meaning of the term in a wholly distinct context: a bill of lading for carriage of goods across international borders. The language and purpose of that contract is readily distinguishable from parties' marine insurance policy.

Having concluded that "U.S. LAW AND PRACTICE" merely indicates parties' choice of American law over English law, the Court finds no conflict between that provision and the provision of the Lloyd's Slip Policy that identifies Washington law as the governing law. *See*

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT - 5

1    Dkt. #18 at 72.  Indeed, Washington law, as the law of a U.S. state, falls within the ambit of

2    "U.S. law" as the Court has construed the meaning of that term.  Consistent with the well-

3    established principle of contract law that specific provisions control over more general terms,

4    the choice of law provision that specifies Washington law as the governing law controls over

5    the more general identification of American law. *Chan*, 123 F.3d 1287, 1296 (9th Cir. 1997)

6    (citing *Brinderson–Newberg Joint Venture v. Pacific Erectors, Inc.,* 971 F.2d 272, 279 (9th Cir.

7    1992)).   On this basis alone, parties' choice of law provision for Washington law supports

8    application of Washington law to this dispute.  *See id.* at 1296–97 ("[W]here the parties specify

9    in their contractual agreement which law will apply, admiralty courts will generally give effect

10   to that choice.").

11

12        Furthermore, the Court finds that application of Washington law to this dispute is

13   consistent with admiralty courts' interpretation of marine insurance policies.  In interpreting a

14   marine insurance policy, state law will control "only in the absence of a federal statute, a

15   judicially fashioned admiralty rule, or a need for uniformity in admiralty practice." *Bohemia,*

16   *Inc.*, 725 F.2d at 510.  Here, "[s]ince Congress has not taken over regulation of marine insurance

17   contracts . . . there is no possible question here of conflict between a state law and any federal

18   statute." *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 314 (1955).  Next, the

19   Court is not aware of any federal, judicially-created rule for marine insurance policies that

20   would apply here.  *See, e.g., Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.,* 190

21   F.3d 26, 30 (2d Cir. 1999) (finding "no specific federal rule governing construction of maritime

22   insurance contracts"); *Littlefield v. Acadia Ins. Co.*, 392 F.3d 1, 6 (1st Cir. 2004) (same).

23   Insurers fail to indicate any federal statute or admiralty rule governing interpretation of the

24   policy's loss of hire provisions.  On the contrary, their briefing cites to federal common law on

25   contract interpretation, *see* Dkt. #86 at 15, thus conceding that there is no relevant federal

26

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT - 6

admiralty rule.  *See also* Dkt. #96-1 at 1 (Insurers' expert stating "[T]here is little documented U.S. law or practice germane to the AB Stewart form or, indeed, to loss of hire insurance in general.").  Finally, this Court finds it improper to fashion a rule in the absence of any statute or judicially-created rule for maritime insurance policies.  *See Wilburn Boat Co.*, 348 U.S. at 316 ("The whole judicial and legislative history of insurance regulation in the United States warns us against the judicial creation of admiralty rules to govern marine policy terms and warranties.  The control of all types of insurance companies and contracts has been primarily a state function . . . .").  For these reasons, having identified no federal statute or judicially-created rule governing interpretation of maritime insurance policies, and concluding that it would be improper to fashion one, the Court looks to state law to govern interpretation of the policies.

Having failed in their argument for applying federal common law and federal admiralty law, Insurers do not identify any other state's law that should apply instead of Washington's.  Although the record in this case does not allow for a comprehensive analysis of contacts of the parties or the insurance policy with the state of Washington, the Court finds that sufficient contacts exist under federal maritime choice-of-law rules to apply Washington law, consistent with parties' choice of law provision.  Insurers pleaded that Washington is the principal place of business for both Icicle Seafoods, Inc. and ISVessel Co, Inc., the engine damage giving rise to this dispute was discovered during a survey and inspection in Seattle, and that the policy's solicitation, negotiation, contracting, issuance and delivery occurred in Washington.  Dkt. #3 at ¶¶ 11, 16-17.  These factors establish sufficient contacts in Washington to apply Washington law.  *Aqua–Marine Constructors, Inc. v. Banks,* 110 F.3d 663, 674 (9th Cir. 1997).

For these reasons, having considered parties' choice of law provision specifying Washington law and the *Wilburn* factors supporting application of state law over federal admiralty law, the Court shall apply Washington law to this dispute.

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT - 7

C.  **Icicle's Entitlement to Jury Trial**

Insurers argue that because this case was brought in admiralty, Icicle has no right to a jury trial. Dkt. #86.  Icicle counters that even though Insurers elected to proceed in admiralty, its compulsory counterclaims entitle it to a jury trial. Dkt. #74.  These counterclaims allege breach of contract, breach of duty of good faith and fair dealing, the Washington Consumer Protection Act ("CPA"), RCW 18.86, and the Insurance Fair Conduct Act ("IFCA"), RCW 48.30.015, and seek a declaratory judgment. Dkt. #18.  For the reasons set forth below, the Court finds that Icicle's jury trial request must be stricken.

District courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled. 28 U.S.C. § 1333.  The "saving to suitors" clause leaves state courts "competent" to adjudicate maritime causes of action for in personam proceedings and allows plaintiffs to bring an action at law in federal district court, provided that the requirements for diversity jurisdiction under 28 U.S.C. § 1332 are met.  *Ghotra by Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1054 (9th Cir. 1997).  A plaintiff seeking to bring in personam maritime claims thus has three options: file a suit in federal court under federal admiralty jurisdiction, in federal court under diversity jurisdiction if the parties are diverse and the amount in controversy is satisfied, or in state court. *Id.*  Although the difference between these options "is mostly procedural," the "greatest significance is that there is no right to jury trial if general admiralty jurisdiction is invoked, while it is preserved for claims based in diversity or brought in state court." *Id.* (citing Fed. R. Civ. P. 38).  Where both admiralty and non-admiralty federal jurisdiction exist, a pleader may designate a claim as an admiralty claim under Fed. R. Civ. P. 9(h) to inform the court that the pleader elects to proceed within the court's admiralty jurisdiction.

There is a "lack of consensus" among federal courts as to whether a defendant bringing compulsory legal counterclaims in response to a plaintiff's admiralty claim is entitled to a jury trial. *Great Lakes Ins. SE v. Andersson*, 525 F. Supp. 3d 205, 207 (D. Mass. 2021). Under Ninth Circuit precedent, "where a federal court has an independent basis of jurisdiction over cases involving admiralty claims, *such as diversity of citizenship*, both the defendant and plaintiff have a right to demand a jury trial under the Seventh Amendment so *long as the suit is one that could traditionally have been brought 'at common law'* . . . ."). *Craig v. Atlantic Richfield Co.*, 19 F.3d 472, 476 (9th Cir. 1994) (emphases added).

Here, Insurers asserted jurisdiction only under this Court's admiralty jurisdiction, 28 U.S.C. § 1333(1), and subject matter jurisdiction for a declaratory judgment under 28 U.S.C. § 2201. Dkt. #3 at ¶ 1. Insurers did not assert any other basis for federal subject matter jurisdiction, nor did they make a Rule 9(h) election indicating their intent to proceed under admiralty despite independent bases of jurisdiction over their claims. Although courts have found that independent jurisdiction exists where a party has asserted diversity jurisdiction, Icicle has not done so here. *Cf. Ghotra by Ghotra*, 113 F.3d at 1058 ("Ghotras clearly asserted diversity as the jurisdictional basis for the in personam claims in each of their Complaints."). For that reason, Icicle's reliance on *Wilmington Trust v. U.S. Dist. Court for Dist. of Hawaii*, where the defendant asserted "[i]ndependent jurisdictional grounds" for each counterclaim, is misplaced. 934 F.2d 1026, 1027–28 (9th Cir. 1991). Given that Icicle has alleged no independent jurisdictional grounds for its counterclaims, its demand for jury trial "does not defeat plaintiff's election to proceed in admiralty with a bench trial." *Albany Insurance Co. v. Gerald Jones*, 1996 AMC 2456, 2456 (D. Alaska 1996).

Icicle argues that supplemental jurisdiction under 28 U.S.C. § 1367 provides an "independent" jurisdictional basis for its counterclaims. However, it is well-established that

supplemental jurisdiction is not an independent basis for federal jurisdiction.  On the contrary, "where there is no underlying original federal subject matter jurisdiction, the court has no authority to adjudicate supplemental claims under § 1367." *Herman Fam. Revocable Tr. v. Teddy Bear*, 254 F.3d 802, 804 (9th Cir. 2001) (collecting cases).  Icicle argues that the U.S. Supreme Court in *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635 (2009), determined that supplemental jurisdiction is an independent basis of subject matter jurisdiction, yet its argument misconstrues that case's holding.  In *Carlsbad*, the trial court had original jurisdiction over federal claims pursuant to federal question jurisdiction, 28 U.S.C. § 1331, and supplemental jurisdiction over related state law claims under 28 U.S.C. §1367(a).  Although the federal claims were dismissed, the Supreme Court found that it nevertheless retained subject matter jurisdiction over the "properly removed state claim[s]." *Carlsbad Tech.*, 556 U.S. at 641.  Here, Icicle's counterclaims are not properly removed state law claims.

Next, Icicle argues that Insurers' request for declaratory relief, brought under 28 U.S.C. § 2201, preserves its right to a jury trial.  Relying on *Beacon Theatres v. Westover*, Icicle contends that it could have brought common law claims, but Insurers won "the race to the courthouse." Dkt. #74 (citing 359 U.S. 500, 501 (1959)).  In *Beacon Theatres*, the U.S. Supreme Court found that counterclaims brought under federal antitrust statutes preserved the defendant's undisputed right to a jury trial, which was not lost "merely because [plaintiff] took advantage of the availability of declaratory relief to sue [defendant] first." *Id.* at 504.  However, Icicle's reliance on *Beacon Theatres* is misplaced—the Declaratory Judgment Act, on its own, did not confer concurrent jurisdiction in admiralty and law.  Rather, the Supreme Court had independent jurisdiction over the antitrust counterclaims under federal question jurisdiction, 18 U.S.C. § 1331.  Here, in contrast, Icicle has offered no independent basis for this Court's jurisdiction such that its counterclaims may be tried at law.  For that reason, its "race to the

courthouse" argument is unavailing.  *Cf. In re Lockheed Martin Corp.*, 503 F.3d 351, 355 (4th Cir. 2007) (party asserting in personam counterclaim where parties were diverse and amount-in-controversy satisfied had right under saving-to-suits clause to demand jury trial on counterclaim in federal court).

For these reasons, having concluded that Icicle's counterclaims have no independent basis for federal subject matter jurisdiction, the Court strikes Icicle's demand for a jury trial. *See Albany Ins. Co.*, 1996 WL 938331, at *1 ("Since there is no indication that defendant's claims are cognizable in anything but admiralty, under *Wilmington*, defendant's demand for a jury trial does not defeat plaintiff's election to proceed in admiralty with a bench trial.").

**D.  Policy Language**

Finally, parties' cross-motions for summary judgment seek a ruling on whether the loss of hire provisions in the USA Marine and Lloyds policies require Icicle to show proof of actual economic loss before the 14-day deductible is triggered.  Two provisions address the loss of hire coverage: (1) Paragraph 1 of the Loss of Charter Hire Insurance – Including War (LPO 455) (ABS 1/10/83 Wording) (hereafter "LOH provision"); and (2) Loss of Hire Special Conditions (hereafter "Special Conditions provision").  The LOH provision reads as follows:

> 1.  If in consequence of any of the following events: Loss, damage or occurrence covered by the Hull & Machinery/War Risks section of this policy, herein[] occurring during the period of this insurance the Vessel is prevented from earning hire for a period in excess of <u>Per policy</u> days in respect of any accident, then this insurance shall pay <u>Per schedule</u> of the sum hereby insured for each 24 hours **or part thereof** after the expiration of said days during which the vessel is so prevented from earning hire for not exceeding a further <u>Per schedule</u> days in respect of any one accident or occurrence [and not exceeding <u>Per schedule</u> days in all during the currency of this Insurance (irrespective of the expiry date of this insurance)], provided that the repairs in respect of which a claim is made hereunder are completed within 12 months of the expiry of the period covered by this Policy.

Dkt. #18 at 56, 92 (emphases in original).  The Special Conditions provision reads as follows:

> 1. This insurance is to pay actual loss sustained, excess of the 14 day each accident deductible/10 day each accident deductible in respect of Herring Operations, up to $250,000 limit of liability for any one day and subject to a primary policy aggregate limit of $15,000,000 for each accident or series of accidents or occurrences arising during the policy period.

Dkt. #18 at 58, 94.  Icicle interprets these provisions as meaning that physical damage to insured property triggers the policy and starts the clock on the 14-day deductible period, without any need to show economic injury.  Dkt. #74.  Insurers, in contrast, argue that the plain language of the policy's deductible requires evidence of actual loss sustained before payment is required.  Dkt. #86.

As determined *supra*, § III(B), the Court shall look to Washington law when analyzing the policy provisions.  Under Washington law, insurance policies are construed as contracts.  *Findlay v. United Pac. Ins. Co.,* 129 Wash.2d 368, 378, 917 P.2d 116 (1996).  The interpretation of an insurance contract is a question of law decided on summary judgment unless "contract terms are ambiguous and contradictory evidence is introduced to clarify the ambiguity." *Estate of Sturgill v. United Servs. Auto. Ass'n,* 84 Wash. App. 877, 880, 930 P.2d 945 (1997).  "Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to and made a part of the policy." RCW 48.18.520.  An insurance policy is construed as a whole, with the policy being given a "'fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'"  *Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co.,* 124 Wash.2d 618, 627, 881 P.2d 201 (1994) (quoting *Grange Ins. Co. v. Brosseau,* 113 Wash.2d 91, 95, 776 P.2d 123 (1989)).  Ambiguities are construed in favor of coverage, and the insurer bears the burden of showing that an exclusion applies.  *Id.*; *McDonald v. State Farm Fire & Cas. Co.,* 119 Wash.2d 724, 731, 837 P.2d 1000 (1992).

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT - 12

Parties agree that one trigger for payment under the policy is damage or loss to a covered property. *See* Dkt. #74 at 17; Dkt. #86 at 14. Under Icicle's interpretation, the analysis ends there: physical damage to insured property triggers the LOH endorsement and starts the clock on the 14-day "per policy" period. Yet this reading ignores the plain language of the LOH provision, which imposes additional requirements to trigger the policy. Not only must there be loss or damage, but "in consequence of" that damage, "the Vessel is prevented from earning hire *for a period in excess of* <u>*Per policy*</u> *days* . . . then this insurance shall pay <u>Per schedule</u> of the sum hereby insured for each 24 hours or part thereof *after the expiration of said days during which the vessel is so prevented from earning hire* . . . ." Dkt. #18 at 58, 92 (emphases added). This clause makes clear that after the vessel is prevented from earning hire in excess of 14 days, then the insurance shall pay "per schedule of the sum" insured for each day after the 14 days has expired. "Per schedule of the sum" clearly references the Special Conditions provision, which provides that the policy pays "up to $250,000 limit of liability for any one day" subject to an aggregate limit of $15,000,000 per accident or series of accidents arising during the policy period. *Id.* That same provision clarifies that the insurance "is to pay *actual loss sustained*" in excess of the 14-day deductible. *Id.* (emphasis added). The Court finds no ambiguity in this policy language.[1]

Icicle argues that the LOH and Special Conditions provisions should be construed as a "waiting period" deductible, wherein "in excess of Per policy days" merely denotes the period of time that must elapse after the physical loss or damage—here, 14 days—before any payment obligation arises under the policy. Dkt. #74 at 18. This interpretation ignores the plain language of the LOH provision, which specifically provides that insurance pay not merely in the event of

---

[1] Parties have both filed motions to strike expert declarations. *See* Dkts. #86 at 20; #94 at 22. Because this Court finds the plain language of the policy unambiguous, it need not consider parties' extrinsic expert opinions.

loss or damage, but "*[i]f in consequence* of . . . loss, damage or occurrence" the vessel cannot earn hire for a period "in excess of" the 14-day period.  Dkt. #18 at 58, 92 (emphasis added). The Court declines to adopt Icicle's strained interpretation.

Having found that the language of the loss of hire provision is unambiguous, the Court need not resort to extrinsic evidence to determine its meaning.  However, even if it found the language ambiguous, the Court finds it persuasive that Icicle's former general counsel and risk manager, Pat Hardina, interpreted identical LOH provisions in a policy covering the vessel GORDON JENSEN ("GJ") as requiring an actual loss sustained during the 14-day deductible period.  *See* Dkt. #89-2 at 4, 6 (GJ LOH provisions); *see also* Dkt. #89-1 at 1 (Hardina stating, "We do have a Loss of Hire policy in effect on the GJ but the deductible period is 14 days *from the first day of lost revenue*.") (emphasis added).  Icicle urges this Court to disregard Hardina's statement as irrelevant.  Dkt. #94 at 19.  The Court disagrees.  Hardina's reading of identical language in a separate insurance policy provides evidence of how the average person purchasing insurance might read the LOH provision—a factor that Washington courts consider when interpreting a policy.  *See Key Tronic Corp.*, 124 Wash. 2d at 627.

Icicle also relies on a statement made by Insurers' average adjuster, Jonathan Spencer, in a December 18, 2018, email stating, "[T]he Marsh presentation relies entirely on the MDD ["Matson, Driscoll & Damico, Ltd."] findings, which might not correctly reflect the effect of the [] 14-day-deductible – they appear to discuss its impact on sales rather than applying it in full to the beginning of the cod season."  Dkt. #76-1 at 4.  Yet this statement, in contrast to Hardina's, provides no insight into Spencer's interpretation of the language of the LOH provision.  Rather, the statement indicates Spencer's belief that the conditions triggering the deductible were met.  As his second declaration clarifies, Spencer assumed at the time he drafted his December 2018 email that Icicle had sustained an actual loss in the 2017 cod season.  Dkt.

#100 at ¶ 3.   After reviewing the November 7, 2019, report nearly a year later, he saw that Insurers' accountants, Alvarez & Marsal Valuation Services ("Alvarez & Marsal"), reported that the GJ handled all processing during the RMT's delayed start such that "RMT and Icicle did not sustain a loss during the cod season in 2017."  *Id.*  For that reason, Icicle's reliance on Spencer's December 2018 statement is unavailing.

For these reasons, having considered the plain language of the insurance policy and parties' interpretations of that language, the Court concludes that the LOH provisions require an actual loss resulting from loss or damage of covered property that prevented the vessel from earning hire in excess of the 14-day period to trigger insurance payment.

**E.  Insurers' Motion for Summary Judgment on Icicle's Counterclaims**

Finally, the Court considers Insurers' Motion for Summary Judgment on Icicle's counterclaims for breach of contract, breach of duty of good faith and fair dealing, the CPA, RCW 18.86, and the IFCA, RCW 48.30.015.  Dkt. #18 at ¶¶ 88-98.  Insurers argue that there is no material dispute of fact to prevent this Court from concluding as a matter of law that Icicle breached its duty to cooperate with Insurers, thus discharging any obligation Insurers had to Icicle under the policy and warranting dismissal of all counterclaims.  Dkt. #111.  Icicle counters that no duty to cooperate exists and, even if it did, material disputes of fact preclude summary judgment.  Dkt. #116.  As determined *supra*, § III(B), Washington law applies here.

i.     Icicle's Duty to Cooperate with Insureds

Insurance policies typically contain a contractual provision that requires the insured to cooperate with the insurer throughout investigation, defense, settlement, or claims handling. *Staples v. Allstate Ins. Co.*, 176 Wash. 2d 404, 295 P.3d 201 (2013).  The scope of an insured's duty to cooperate "depends primarily upon the language of the particular cooperation clause."

16 Williston on Contracts § 49:109 (4th ed.).   The relevant clause in the USA Marine Policy

reads as follows:

> 5. In the event of an occurrence giving rise to a claim under this policy, the Assured agrees to work in conjunction with the underwriters in determining timing, preparation and man power capabilities of using other available insured vessels to help mitigate the overall loss.

Dkt. #18 at 58.   Icicle argues that the clause cited above is not a cooperation clause but rather

a mutual loss mitigation clause wherein parties agreed to "work in conjunction" in order to

"help mitigate the overall loss."   Dkt. #116 at 8.   Yet "work in conjunction" is precisely the

definition of cooperation.   This term is unambiguous and clearly sets forth Icicle's duty to

cooperate with Insurers.   Construing this provision with the loss of hire condition requiring

Insurers "to pay actual loss sustained, excess of the 14 day each accident deductible," Dkt. #18

at 58, the policy expressly required Icicle to cooperate with Insurers in determining the capacity

of other vessels to mitigate the overall loss.   Cooperation between an insurer and insured, as

recognized in *Staples*, requires "a continuous exchange of information between insurer and

insured interspersed with activities that affect the rights of both."   *See* 176 Wash. 2d at 411, 295

P.3d 201 ("Cooperation is essential to the insurance relationship because that relationship . . . .

can function only if both sides cooperate.").   For that reason, Icicle's argument that the provision

requires parties to "work constructively" without imposing any duty to communicate

contravenes the plain language of the policy.   Insurers' reading, in contrast, is consistent with

the plain language and intent of the provision that parties work collaboratively to determine

Icicle's ability to mitigate the loss.

      In light of this express cooperation clause, Icicle's alleged non-compliance with its duty

to cooperate is a proper affirmative defense brought by Insurers under Washington law.   *In re

Feature Realty Litig.*, 634 F. Supp. 2d 1163, 1175 (E.D. Wash. 2007); *Pilgrim v. State Farm*

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT - 16

*Fire & Cas.,* 89 Wash. App. 712, 725, 950 P.2d 479 (1997).  Because the Court has determined

that the policy contains an express cooperation clause, it need not address Insurers' alternative

arguments that an implied duty exists under the contract.

ii.    Icicle's Breach of Duty

Having determined that the policy contains an express cooperation clause requiring

Icicle to cooperate with Insurers, the Court now addresses the issue of whether Icicle breached

its duty to cooperate.  Under *Staples*, an insurer claiming a noncooperation defense bears the

burden of showing (1) its requests for information were material; (2) the insured failed to

substantially comply with the cooperation clause; and (3) it suffered actual prejudice as a result

of the insured's noncompliance.  176 Wn.2d at 413, 295 P.3d 201.  For the reasons set forth

below, the Court finds that Icicle breached its duty to cooperate as a matter of law.

1.   Material Requests for Information

Under a general cooperation clause, an insurer's requests for information "must be

'material to the circumstances giving rise to liability on [the insurer's] part.'"  *Id.* (quoting *Dien*

*Tran v. State Farm Fire & Cas. Co.,* 136 Wash.2d 214, 224, 961 P.2d 358 (1998)).  "Information

is material when it concerns a subject relevant and germane to the insurer's investigation as it

was then proceeding at the time the inquiry was made."  *Tran*, 136 Wash.2d at 224, 961 P.2d

358 (internal citation and quotation omitted).

Insurers argue that several requests for information were material to its investigation of

Icicle's loss of hire claim: (a) Icicle's financial records for 2013-2017; (b) fish purchase records

for the GJ and the RMT for cod, herring, sockeye and pink salmon; (c) product sales and

inventory records for cod, herring, sockeye and pink salmon, and detailed inventory schedules

for those products; and (d) vessel planning and operations schedules for the GJ and RMT for

the cod, herring, sockeye and pink salmon fisheries, and communications that Icicle was advised

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT - 17

that there was excess supply of pink salmon in Area M.  Dkt. #112-11 at 1 (June 19, 2019 e-mail from Alvarez & Marsal to MDD).  Insurers also sought answers to general questions about Icicle's sales expenses, saved expenses, and unused purchasing and processing capacity of the GJ, as well as specific questions regarding mitigation of the RMT's cod losses, the RMT's plans not to process herring, and Icicle's historical purchase and processing of pink salmon from Area M in 2015-2017.  *Id.* at 2-4.

Icicle argues that the materiality of these requests is in dispute for five reasons: (1) the requested material is now in Insurers' possession and has not changed their loss measurement; (2) none of the information was lost or destroyed, and Insurers now have it; (3) documentation concerning prior fishery seasons is not material to the quantum of its claim; (4) Insurers did not request or rely on these documents when they adjusted the related loss of hire claim for the GJ; and (5) Insurers' requests regarding the RMT's plans not to process herring in 2017 were not material to its loss of hire claim.  Dkt. #116 at 16-19.  Icicle's first two arguments are easily discarded as they have no bearing on whether the requested information was relevant or germane to Insurers' investigation at the time the inquiry was made.

Turning to Icicle's remaining arguments, no reasonable juror could conclude that a company's profitability in the years prior to the claimed loss is irrelevant to estimating its lost profits.  Icicle relies on expert declarations distinguishing the restaurant business from the fishing industry, wherein profits from a 2015 fishing season are "not necessarily predictive of profit in a 2017 season."  Dkt. #119 at ¶ 9.  This is because fishery supply depends on the size of the run, which varies from year-to-year.  Indeed, in 2017, the pink salmon run in Area M was not only large but "far exceeded" the same pink salmon run of the prior four years as well as the size of the 2018 run estimated by fisheries scientists.  Dkt. #117 at ¶ 13.  Notwithstanding the variability of a company's profit from year to year, historic performance is relevant to

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT - 18

estimating lost profits from an interrupting event.  *See, e.g.*, *Georgia-Pacific Corp. v. Allianz Ins. Co.*, 977 F.2d 459, 463 (8th Cir. 1992) (holding that unprofitable business "cannot prove it failed or will fail to earn net profits"); *Puget Sound Lumber Co. v. Mechanics' & Traders' Ins. Co.*, 168 Wash. 46, 51, 10 P.2d 568, 569 (1932) (determining whether recovery available to lumber company under business interruption insurance requires "due consideration" of company's experience before interrupting event as well as probable experience thereafter). Even if past profits are less relevant to loss calculation in the fishing industry compared to other industries, no reasonable juror could conclude that Icicle's historic profits are so unrelated to the loss calculation such that they are wholly irrelevant.  Insurers' request for past financial records to determine past profitability was therefore material as a matter of law.

Next, Icicle argues that "many of the documents Insurers claim are material . . . were not requested or relied upon by Insurers" when they adjusted the loss of hire claim for the GJ. Dkt. #116 at 18.  Icicle fails to identify the data requests or general questions encompassed by this argument.  Moreover, the e-mail Icicle relies upon only indicates that this issue applies to General Questions 1, 2, 3 and 4(a).   This argument does not refute the materiality of the four data requests sought by Insurers or the remaining questions that Icicle refused to answer.

Finally, Icicle challenges the materiality of question 7 regarding the RMT's plans to not process herring.  Dkt. #116 at 18-19.  This question addressed an exchange between parties' accountants on May 31, 2017, wherein Icicle's accountant stated that the RMT's production schedule was only 5 weeks in 2017 because "it had a time sensitive engine repair pending in Seattle *and it was not slotted to process herring in Togiak after the cod season (the Jensen was).*"  Dkt. #114-1 at 1 (emphasis added).  Insurers repeatedly sought clarification of this statement to determine whether the RMT was originally scheduled to process herring in 2017. If Icicle claimed it was, Insurers sought planned vessel operations and schedules for the RMT

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT - 19

in 2017 to corroborate this claim.  Dkt. #114-2 at 8.  Icicle's response does not refute the materiality of Insurers' request.  Instead, it merely repeats its position that the RMT would have participated in the 2017 herring fishery but for the hull claim.  *See* Dkt. #116 at 18-19.  This argument does not raise a material dispute of fact that Insurers' request for clarification, which included a request for corroborative evidence of planned vessel operations and schedules, was material to their investigation.

2.   Icicle's Failure to Substantially Comply

Having concluded that Insurers' questions were material to their investigation of Icicle's LOH claim, the Court must consider whether Icicle failed to substantially comply with these requests.  Icicle argues that genuine factual disputes remain as to whether Icicle substantially complied with Insurers' requests, given Icicle's forensic accounting expert's conclusion that the information provided to Insurers "was sufficient to opine on Icicle's loss of hire measurement." Dkt. #118 at ¶ 5.  Yet whether the documents Icicle provided were "sufficient to opine" is not the inquiry.  The question is whether Icicle responded to Insurers' requests, which the Court has already determined were material to the loss of hire investigation and claim settlement.  *See Georgian House of Interiors v. Glens Falls Ins. Co.*, 21 Wn.2d 470, 492–93, 151 P.2d 598 (1944) ("It is not for appellant to say that . . . such inspection and examination was a substantial compliance with the provisions of the policies . . . after a proper demand made upon it.").  Icicle's argument is therefore irrelevant to the issue of whether it substantially complied.

Icicle also contends that it produced "troves of documents" and "access to the same financial data that Icicle's own forensic accountant relied on" prior to this litigation.  Dkt. #116 at 19.  In support of this proposition, Icicle cites to its motion to compel, which in turn states that "[a]ll MDD reports and source materials relied on to create those reports were uploaded to a shared drive and shared with Insurers' representatives well before this litigation was initiated

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 20

in the summer of 2018." Dkt. #78 at 11.  Icicle does not cite to any evidence in support of this assertion, nor does this statement indicate which documents were produced and how they substantially complied with Insurers' requests.  This unsupported assertion does not raise a material dispute of fact that Icicle substantially complied with Insurers' requests.  Furthermore, any notion that Icicle substantially complied with Insurers' requests is dispelled by Insurers' document requests and motion to compel filed in this litigation, which sought the very records initially requested in their investigation.  *See, e.g.*, Dkt. #71 at 6 (RFP 1 seeking operating schedules and records for RMT and GJ for 2014 through 2020, noting that Icicle failed to produce any vessel plans or schedules for 2016 or 2017); at 7 (noting gaps in fish processing and production records); at 8 (missing records for Area M pink salmon catch and processing records); at 10 (identifying missing expense and inventory records).

Finally, Icicle argues that it was relieved of any duty to cooperate with Insurers' requests after June 2019 based on Insurers' treatment of an expert report drafted by independent fishing expert Tom Manos.  Manos was retained by Insurers to investigate and draft a report on the pink salmon Icicle would have been able to process in Area M in 2017 ("the Manos Report").  *See* Dkt. #97 at 3.  Icicle contends that Insurers accidentally disclosed the Manos Report to Icicle during a meeting on June 11, 2019.  However, on October 13, 2020, Icicle discovered an email from Insurers' counsel dated June 20, 2019, stating that Insurers "intend[ed] to retain [the Manos] report as a consulting expert report and not disclose it to the assured."  Dkt. #46-1 at 37.  Icicle argues that Insurers' unsuccessful attempt to bury the Manos Report breached the insurance policy and therefore discharged Icicle's duty to cooperate.  Dkt. #116 at 20 (citing *Kienle v. Flack*, 416 F.2d 693 (9th Cir. 1969); *Rushforth Constr. Co., Inc. v. Wesco Ins. Co*., 2018 WL 1610222 (W.D. Wash. Apr. 3, 2018)).

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT - 21

As an initial matter, the breaches at issue in *Kienle* and *Rushforth*, which involved improper denial of coverage and breach of duty to defend, are distinguishable from the alleged breach at issue here. *See Kienle*, 416 F.2d at 695 (insurer estopped from relying on breach of cooperation clause "occurring *after the insurer has improperly denied coverage under the policy*.") (emphasis added); *Rushforth Constr. Co.*, 2018 WL 1610222, at *3 (insured discharged from duty to cooperate "when its insurer *has materially breached its duty to defend*.") (emphasis added). Here, Icicle argues that Insurers' treatment of the Manos Report "violated Insurers' duties to Icicle and breached the Policies." Dkt. #116 at 20 (citing motion to disqualify and Answer). Icicle provides no support for its proposition that *Kienle* and *Rushforth* extend to the alleged breach at issue here. Moreover, since Icicle received the Manos Report in June 2019, no reasonable juror could conclude that an email indicating Insurers' intention to not disclose the report had any prejudicial effect. Given that damages are a required element of breach of contract, Icicle's conclusory assertion is insufficient to raise a material dispute of fact that Insurers committed a breach that discharged Icicle's duty to cooperate. *See Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995) (breach of contract only actionable if breach proximately causes damage).

Finally, even if the Court found a material dispute of fact as to whether Insurers' treatment of the Manos Report constituted breach, it is undisputed that the June 2019 email followed Icicle's refusal to provide responses to Insurers' repeated requests for information. *See* Dkt. #112 at ¶ 5 (correspondence between parties' counsel dated June 27, 2018 through May 24, 2019). For that reason, any alleged breach by Insurers came after Icicle's failure to substantially comply through refusals to provide the requested information. As set forth in *Kiele* and *Rushforth*, an insured's duty to cooperate is only discharged *after* its insurer has materially

breached the contract.  Here, Icicle's failure to substantially comply with the request preceded the alleged June 2019 breach by Insurers.

For the reasons set forth above, given that there is no issue of fact that Icicle was required to cooperate with Insurers' requests and that these requests were materially relevant, no reasonable juror could conclude that Icicle substantially cooperated in the investigation or settlement of its claim.  *See Tran*, 136 Wash. 2d at 228, 961 P.2d 358 (finding breach of cooperation clause as a matter of law where insured failed to turn over requested information and information was material to investigation).

### 3. Actual Prejudice to Insurers

Lastly, the Court must consider whether Insurers were prejudiced by Icicle's failure to cooperate.  *See id.* ("An insured's breach of a cooperation clause releases the insurer from its responsibilities if the insurer was actually prejudiced by the insured's breach.") (citing *Public Util. Dist. No. 1 v. International Ins. Co.,* 124 Wash.2d 789, 803, 881 P.2d 1020 (1994)).  An insured's interference with the insurer's ability to evaluate and investigate a claim may cause actual prejudice.  *Canron, Inc. v. Federal Ins. Co.,* 82 Wash.App. 480, 491, 918 P.2d 937 (1996), *review denied,* 131 Wash.2d 1002, 932 P.2d 643 (1997).  However, "prejudice is an issue of fact and will seldom be established as a matter of law." *Tran*, 136 Wash. 2d at 228, 961 P.2d 358.  Claims of actual prejudice require "affirmative proof of an advantage lost or disadvantage suffered as a result of the [breach], which has an identifiable detrimental effect on the insurer's ability to evaluate or present its defenses to coverage or liability." *Id.* (citing *Canron,* 82 Wash. App. at 491–92, 918 P.2d 937).

Icicle argues that Insurers were not prejudiced by its failure to respond given that it eventually complied with many of these requests.  Dkt. #116 at 22.  However, courts have rejected delayed compliance as a basis for finding no actual prejudice.  *See id.* ("Tran's assertion

that State Farm was not prejudiced by his failure to provide financial records and tax returns, due to his eventual compliance . . . is simply a restatement of his argument that he substantially complied with State Farm's requests and, thus, did not breach the cooperation clause."). As in *Tran*, the Court rejects Icicle's argument that delayed compliance mitigates prejudice and finds that Insurers need only establish that Icicle's failure to produce these items prejudiced its ability to determine coverage. *Id.*

Here, no reasonable juror could find that Insurers were unhampered by Icicle's failure to provide this material information. Where an insurer is unable to complete an investigation of facts due to an insured's failure to provide relevant records, courts have found prejudice as a matter of law. *See, e.g.*, *Pilgrim*, 89 Wash. App. 712, 950 P.2d at 486 ("Without access to financial documents, State Farm could not evaluate the validity of the Pilgrims' claim. It could not decide whether the claim was covered, much less prepare a defense to the inevitable suit by the Pilgrims if it denied coverage."); *Tran*, 136 Wash. 2d 214, 231–32, 961 P.2d 358 ("[I]t is uncontroverted that Tran's intransigence prevented State Farm from completing a legitimate investigation in order to determine whether or not coverage should be provided."). Icicle relies on *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.* for the proposition that an insured's delay does not automatically inflict prejudice on the insurer. *See* 164 Wash. 2d 411, 431, 191 P.3d 866, 878 (2008). Yet *Enumclaw* addressed an insured's delay in providing the insurer with notice of its claim, which is distinguishable from an insured's refusal to comply with an insurer's requests for material information. For these reasons, consistent with *Pilgrim* and *Tran*, this Court concludes as a matter of law that Icicle's failure to provide material records or respond to Insurers' questions hampered Insurers' investigation and therefore caused actual prejudice.

Accordingly, the Court finds no material dispute of fact that Icicle breached its duty to cooperate with Insurers.

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT - 24

iii.      Discharge of Insurers' Obligations under Policy

Having concluded that Icicle breached its duty to cooperate as a matter of law, its counterclaims are properly dismissed.  Under Washington law, where an insured breaches its duty to cooperate, the insurer is relieved from its obligations under the policy.  *See Pilgrim*, 89 Wn. App. at 724, 950 P.2d 479 (granting summary judgment dismissal of coverage declaration, attorney fees and damages under CPA where insured breached cooperation clause); *McLanahan v. Farmers Ins. Co.*, 66 Wn. App. 36, 40, 831 P.2d 160 (1992) (affirming dismissal of insured's claims for unreasonable delay and CPA violation), *review denied*, 120 Wn.2d 1006 (1992). Given the Court's determination that Insurers have been discharged of their obligations arising from the policy, Icicle's counterclaims for breach of contract and breach of duty of good faith automatically fail.  *See id.*  Icicle's counterclaim for declaratory judgment, which seeks a construction of the policy and extent of coverage available, fails for the same reasons.  *See* Dkt. #18 at ¶¶ 84-87.

Turning to Icicle's remaining counterclaims under the Consumer Protection Act, RCW 19.86 and the Insurance Fair Conduct Act, RCW 48.30.01, both claims fail as a matter of law given Icicle's breach.  Starting with Icicle's IFCA counterclaim, Icicle alleges that Insurers acted unreasonably in adjusting its LOH claim by unreasonably denying coverage and unreasonably depriving Icicle of policy benefits.  *Id.* at ¶¶ 97-98.  Again, because Insurers' obligations arising from the policy were discharged by Icicle's failure to cooperate, *Pilgrim*, 89 Wn. App. at 724, 950 P.2d 479, Insurers did not owe any duty to Icicle with respect to providing coverage or policy benefits.  This counterclaim likewise fails as a matter of law.

Similarly, Icicle's CPA counterclaim alleges that Insurers engaged in bad faith handling of Icicle's claims and breached their duty of good faith to Icicle.  Dkt. #18 at ¶¶ 94-96.  Icicle specifically cites to Washington insurance regulations that Insurers allegedly violated.  *See id.*

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT - 25

Because Insurers did not owe Icicle any duty under the policy to provide coverage, Icicle's CPA counterclaim fails as a matter of law. *Tran*, 136 Wash. 2d at 228, 961 P.2d 358 (granting summary judgment dismissal of insured's CPA claim where insured breached cooperation clause); *Pilgrim*, 89 Wn. App. at 724, 950 P.2d 479 (same).

## IV.   CONCLUSION

Having reviewed Defendants-Counterclaim Plaintiffs Icicle's and Plaintiffs-Counterclaim Defendants Insurers' cross-motions for partial summary judgment, Insurers' motion for summary judgment on Icicle's counterclaims, parties' responses and replies thereto, the declarations and exhibits in support thereof, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Icicle's Motion for Partial Summary Judgment, Dkt. #74, and Insurers' Cross-Motion for Partial Summary Judgment, Dkt. #86, are resolved as follows:

    a.   Washington law applies to this dispute;

    b.   Icicle's request for jury trial is STRICKEN;

    c.   Icicle is required to demonstrate an actual loss sustained of net earnings lost during the 14-day deductible period for the 2017 cod or sockeye salmon seasons.

(2) Insurers' Motion for Summary Judgment, Dkt. #111, is GRANTED.   Icicle's counterclaims are DISMISSED.


DATED this 19th day of November, 2021.


RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER RE: MOTIONS FOR SUMMARY
JUDGMENT - 26